UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

ALLSTATE INSURANCE COMPANY,

      Plaintiff,

      Case No. 3:15-cv-240

vs.

MELISSA PAPANEK, *et al*.,

      Magistrate Judge Michael J. Newman
      (Consent Case)

      Defendants.

---

**DECISION AND ENTRY: (1) TERMINATING THE PARTIES' PREVIOUSLY FILED MOTIONS FOR SUMMARY JUDGMENT (DOCS. 176, 177); (2) DENYING DEFENDANT MICHAEL PAPANEK'S MOTION FOR SUMMARY JUDGMENT (DOCS. 124, 168); (3) DENYING THE MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS MELISSA PAPANEK AND PHOENIX INSURANCE AND FINANCIAL GROUP, LLC (DOC. 185); (4) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. 195); (5) GRANTING DEFENDANTS' MOTION FOR LEAVE TO SUPPLEMENT THE RECORD (DOC. 218); AND (6) GRANTING THE PARTIES' MOTIONS FOR LEAVE TO FILE DOCUMENTS UNDER SEAL (DOCS. 205, 208)[1]**

---

      This civil consent case, arising under the Court's diversity jurisdiction, *see* 28 U.S.C. § 1332, concerns, *inter alia*, breach of contract claims following the termination of an exclusive agent agreement between Allstate Insurance Company ("Allstate") and its former exclusive agent Melissa Papanek ("Melissa"). Phoenix Insurance and Financial Group, LLC ("Phoenix"), an independent insurance agency founded by Melissa following her termination from Allstate, is also a Defendant in the case. Melissa's father, Michael Papanek ("Mike"), who was Melissa's employee both while she remained an Allstate exclusive agent and after she founded Phoenix, is also a Defendant.

---

[1] The Court grants the parties' motions in this regard having found compelling reasons justify the relief sought. *See* doc. 183; *Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299 (6th Cir. 2016).

Now before the Court are the following: (1) Mike's motion for summary judgment (doc. 124), which was subsequently supplemented by him (doc. 168); (2) the motion for summary judgment filed by Melissa and Phoenix (doc. 185); and (3) Allstate's motion for summary judgment (doc. 195) with regard to counterclaims asserted by Melissa and Phoenix.[2] The parties filed appropriate memoranda in opposition, as well as reply memoranda.[3] The Court has carefully considered all of the foregoing, as well as evidence presented in support of summary judgment, and the parties' motions are now ripe for decision.

## I.

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment -- rather, all facts must be viewed in the light most favorable to the non-

---

[2] The parties originally filed their dispositive motions (docs. 176, 177) in conjunction with a number of motions to file certain exhibits under seal (docs. 171, 172, 173). The Court granted the parties' motions for leave to file materials under seal and, in doing so, directed that the parties refile their motions for summary judgment with appropriately redacted and/or sealed exhibits. Doc. 175. Because the motions for summary judgment were refiled as directed, the Court **TERMINATES** the previously filed motions (docs. 176, 177) on the Court's docket.

[3] Melissa and Phoenix move for leave to supplement the summary judgment record. Doc. 218. These Defendants attached documents they seek the Court to consider on summary judgment. *Id.* For good cause shown, the Court **GRANTS** the motion for leave and considers the record appropriately supplemented.

moving party." *Id.*

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted). Instead, the party opposing summary judgment has a shifting burden and "must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." *Id.* (citation omitted). Failure "to properly address another party's assertion of fact as required by Rule 56(c)" could result in the Court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Finally, "there is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Buarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted). Instead, "[i]t is the attorneys, not the judges, who have interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome." *Id.* at 406. In other words, "the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." *Id.*

## II.

Many of the facts at issue in this case are disputed. In support of their summary judgment motions, the parties cite to deposition testimony, sworn statements, and numerous exhibits attached to their respective memoranda in an effort to set forth the relevant factual background. The Court has carefully considered all of the proper Rule 56 evidence submitted by the parties on summary judgment, *see* Fed. R. Civ. P. 56(c)(1)(A), and unless otherwise stated herein, the following are the undisputed facts of the case.

**Contractual Relationship Between the Parties**

In 1972, Mike opened an Allstate exclusive agency, which came to be called the Papanek Agency, at 4048 Colonel Glenn Highway in Beavercreek, Greene County. Doc. 161 at PageID 4001. In 2008, Melissa purchased Mike's economic interest in the Papanek Agency. Doc. 158 at PageID 3358-59. As part of the transfer of the Papanek Agency, Melissa entered into an exclusive agency agreement ("EA Agreement") with Allstate on August 13, 2008. Doc. 185-1 at PageID 5065-74. The EA Agreement authorized Melissa to sell Allstate insurance products and prohibited her from "either directly or indirectly, solicit[ing], sell[ing], or servic[ing] insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of [Allstate]." Doc. 195-2 at PageID 5696.

After selling his economic interest to Melissa, Mike continued selling insurance for the Papanek Agency as a Licensed Service Provider ("LSP"),[4] and executed an LSP Agreement with the Papanek Agency on October 26, 2008. Doc. 130 at PageID 2639; doc. 130-2 at PageID 2700-01. Allstate was a third-party beneficiary of the LSP Agreement, an agreement in which Mike agreed to "not, either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker without the prior written consent of [Allstate]." *Id*.

Both Melissa's EA Agreement and Mike's LSP Agreement provided for the protection of Allstate's confidential information. Melissa's EA Agreement provided that confidential information, such as "the names, addresses, and ages of [Allstate] policyholders[,]" were "wholly owned" by Allstate. Doc. 195-2 at PageID 5697, 5699. Melissa, however, was permitted "use" of such confidential information, but "only for the purposes of carrying out the provisions of [the

---

[4] LSPs assist Exclusive Agents by "receiving and accepting applications for insurance" and "selling certain specified [Allstate] products" to customers in the Exclusive Agency's market. Doc. 130-2 at PageID 2700.

contract]," *i.e.*, "soliciting, selling, and servicing insurance and other [Allstate] Business[.]" *Id*. Substantially similar provisions were set forth in Mike's LSP Agreement. *See* doc. 130-2 at PageID 2700.

## Termination of the Relationship Between the Parties

In March of 2013, Mike suffered a stroke; he did not work during his recovery. Doc. 182 at PageID 4746. According to Allstate records, the Papanek Agency terminated Mike's LSP Agreement on March 4, 2013 after he suffered the stroke. Doc. 160 at PageID 3995. However, by November 2013, Mike's health had substantially improved, and he returned to his job as an LSP at the Papanek Agency. Doc. 182 at PageID 4746. The parties point to no evidence, however, that Mike executed a subsequent LSP Agreement upon his return in November 2013.

Melissa's EA Agreement was terminable by either her or Allstate, "with or without cause, upon providing ninety (90) days prior written notice to the other" party. *Id*. at PageID 5703. On September 2, 2014, Allstate exercised its right under the EA Agreement and, both in person and in writing, notified Melissa that it was terminating the EA Agreement effective December 1, 2014. Doc. 195-3 at PageID 5707-08; doc. 195-4 at PageID 5710. According to Allstate, it exercised its right to terminate Melissa's EA Agreement because she admitted to improperly issuing auto and homeowners policies without the customers' knowledge; intentionally refusing to remove vehicles from customers' auto policies; and delaying cancellation of certain policies until after December 2013 in order to receive year-end bonuses. Doc. 195-4 at PageID 5710.

## Rights and Duties Upon Termination

Under the EA Agreement, Melissa was permitted to "transfer [her] entire economic interest in the business written under [the EA Agreement] . . . by selling the economic interest in the business to an approved buyer." *Id*. at PageID 5702. Upon notifying Melissa of termination, Allstate reminded her of her ability to sell her economic interest so long as the sale occurred by

the termination date of December 1, 2014. Doc. 198-5 at PageID 6359. Under the EA Agreement, however, Allstate "retain[ed] the right in its exclusive judgment to approve or disapprove such a transfer." *Id*. Notably, "[a]pproval of a proposed transfer" was "conditioned upon[,]" *inter alia*, "the execution of a then current agency agreement by the proposed transferee." *Id*. Melissa was unable to sell her economic interest and, according to her, Allstate impeded her efforts in that regard despite interested purchasers. *See* doc. 198 at PageID 6317-18.

Pursuant to the EA Independent Contractor Manual, which was made part of the EA Agreement between the parties, in the event Melissa was unable to sell her economic interest, she could "elect to receive [a] termination payment, subject to the terms and conditions of the [EA] Agreement[.]" Doc. 158-1 at PageID 2538 (SEALED). Pursuant to the Supplement to the EA Agreement, which was also incorporated as part of the contract between the parties, termination payments "are subject to compliance with the terms of the confidentiality and non-competition provisions of the [EA Agreement], which survive termination of the agreement." Doc. 158-1 at PageID 3553 (SEALED). Ultimately, Melissa accepted the termination payments; a dispute exists as to whether such choice was voluntary or whether such choice was forced upon her by Allstate. Doc. 195-23 at PageID 5991; doc. 195-24 at PageID 5993.

In addition to the foregoing, upon termination of the EA Agreement, Melissa Papanek was required to, *inter alia*, "immediately return all property belonging to [Allstate], or dispose of it in such manner as the Company specifie[d]" and "immediately cease" using all telephone numbers used to conduct business under the EA Agreement. Doc. 195-2 at PageID 5703. Further, for "one year following termination" of the contract, Melissa Papanek was also prohibited from "solicit[ing] the purchase of products or services in competition with those sold by [Allstate]" to certain people, companies, or organizations who were Allstate customers at the time of termination. Doc. 195-2 at PageID 5704. Specifically, Melissa Papanek could not solicit Allstate customers that: (1) she

or anyone working on her behalf sold Allstate products to; or (2) whose identity was discovered because of access to Allstate confidential information. *Id.* Finally, upon termination of the agreement, Melissa Papanek agreed not to solicit the purchase of products in competition with Allstate products within a mile of the office in which she sold Allstate products during the contract period. *Id.* at PageID 5704. Mike's LSP Agreement had similar prohibitions. Doc. 130-2 at PageID 2700-01.

### Papanek Conduct Immediately Following the Notice of Termination

Upon receiving the 90-day notice of termination from Allstate on September 2, 2014, Melissa's reaction was to "get Allstate" and she discussed with employees of the Papanek Agency her desire to solicit Allstate customers away to her independent agency. *See* doc. 158 at PageID 3379. Almost two months later, in late October 2014, Melissa spent ten to twelve hours a day, for four straight days, printing confidential information for hundreds of Allstate customers with the specific intent of using such confidential material to solicit them for her new insurance agency. Doc. 196-1 at PageID 6109-11. In fact, Melissa admits she printed the voluminous amount of confidential information intending "to take back the book" from Allstate. *Id.* at 6111. Melissa acknowledges that printing the confidential information was "a bad decision" and testified in her deposition that, upon realizing her actions were wrong, she shredded the documents. *Id.* at 6110.

It is also undisputed that Papanek hung a sign on the door of the Papanek Agency after receiving the 90-day notice of termination from Allstate. *See* doc. 158 at PageID 3401. The sign on the door read:

> The Papanek Agency
>
> Thanks You for your business
>
> Mike & Melissa are opening an Independent Insurance Agency at their previous North Dixie location, 3801 North Dixie, in January.
>
> If you have any questions you can reach Mike & Melissa at 937-781-6717

Thank you for your business.

Doc. 195-25 at PageID 5995. Without dispute, the phone number on the sign was Melissa Papanek's cell phone number. Doc. 158 at PageID 3401.

In addition to these undisputed facts, Allstate points to other, albeit disputed facts, that Melissa was accumulating Allstate customer information and even contacting Allstate customers to inform them of potentially cheaper rates beginning on December 1, 2014, *i.e.*, following her termination as an Allstate agent. *See* doc. 195-1 at PageID 5655-56.

According to Allstate, after learning of Melissa's activities showing -- or at least suggesting -- her intent to solicit Allstate customers following her termination as an Allstate agent in violation of the EA Agreement, Allstate representatives Ted Stefanov and Cathy Fouty arrived at the Papanek Agency on October 31, 2014, read the termination letter previously issued on September 2, 2014, and "shut [the Agency] down." Doc. 198-2. Notably, under the EA Agreement, Allstate possessed to contractual right, after giving Melissa Papanek 90-days written notice of termination, to require her to "cease to act or represent [her]self in any way as an agent or representative of [Allstate][.]" Doc. 195-2 at PageID 5703.

## Post-Termination

Following termination of the EA Agreement on December 1, 2014, Allstate began making termination payments to Melissa in January 2015. Doc. 185-9 at PageID 5098. Melissa opened Phoenix in January 2015 at a former Papanek Agency location on North Dixie Drive in Dayton, Ohio. Doc. 185 at PageID 5049. Allstate contends that Melissa solicited Allstate customers after opening Phoenix. *See* doc. 185-6 at PageID 5086-88. On May 15, 2015, Allstate sent Melissa's attorney a cease-and-desist letter. *See id*. In November 2015, Allstate began withholding installments of Melissa's termination payments because of the issues involved in this case. *See* doc. 185-8 at PageID 5096. Of the $692,261.10 of termination payments supposedly due and

owing to Melissa, she has not been paid $374,974.79.  Doc. 185-8 at PageID 5096; doc. 185-9 at PageID 5098.

**Litigation**

Allstate filed this action against Defendants on July 6, 2015, *i.e.*, before it ceased making termination payments to Melissa.  Doc. 1.  The operative pleadings before the Court at this time are Allstate's first amended complaint (doc. 22) and the first amended answer and counterclaim by Melissa and Phoenix (doc. 34).

In the first amended complaint, Allstate names three Defendants, namely Melissa, Mike, and Phoenix.  Doc. 22 at PageID 253.  Allstate specifically asserts the following claims: (1) breach of contract (against Melissa); (2) breach of contract (against Mike); (3) misappropriation of trade secrets (against all three Defendants); (4) tortious interference with contractual relationships (against Phoenix); (5) tortious interference with business relationships (against all three Defendants); and (6) unfair competition (against all three Defendants).  Doc. 22.  Melissa asserts the following counterclaims against Allstate: (1) breach of contract; (2) tortious interference with contractual and business relationships; (3) violations of Ohio's Deceptive Trade Practices Act ("ODTPA"), Ohio Rev. Code § 4165.011 *et seq.*; (4) breach of the covenant of good faith and fair dealing; and (5) unfair competition.  Doc. 34.  Phoenix joins in Melissa's ODTPA and unfair competition counterclaims.  *See* doc. 34 at PageID 458-61.

**III.**

As noted above, each party has filed a separate motion for summary judgment.  The Court will address each motion for summary judgment in turn.

<u>**MELISSA'S AND PHOENIX'S MOTION FOR SUMMARY JUDGMENT (DOC. 185)**</u>

Melissa seeks partial summary judgment on her counterclaims asserting breach of contract. *Id*.  In addition, both Melissa and Phoenix seek summary judgment on all claims asserted by

Allstate. *Id*. For all of the reasons set forth *infra*, the motion for summary judgment filed by Melissa and Phoenix (doc. 185) is **DENIED** in all respects.

### A.    Melissa's Motion - Breach of Contract Counterclaims

Melissa moves for partial summary judgment with regard to her breach of contract counterclaims, including allegations asserting a breach of the covenant of good faith and fair dealing. *Id*. at PageID 5055. In this diversity action, in which the parties cite Ohio law in support of their claims, contract interpretation is a question of law for the court. *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 691 F.3d 821, 826 (6th Cir. 2012) (citing *Leber v. Smith*, 639 N.E.2d 1159, 1163 (1994)). In addition, where the facts are undisputed, "whether they constitute a performance or a breach of [a written] contract, is a question of law for the court." *Travelers Indem. Co. v. Cochrane*, 98 N.E.2d 840, 846 (1951); *see also Ohio Educ. Ass'n v. Lopez*, No. 09AP-1165, 2010 WL 4102948, at *3 (Ohio Ct. App. Oct. 19, 2010).

"Ohio law instructs that contracts be interpreted to give effect to the parties' intent." *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 527 (6th Cir. 2017). "To discern the parties' intent, courts look to the plain and ordinary meaning of the language used in their agreement." *Id*. "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (quoting *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 875 N.E.2d 561, 566 (2007)). Only when contract terms are unclear or ambiguous may a court consider extrinsic evidence to ascertain the parties' intent. *Id*. Ambiguity exists "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Id*. (citations omitted). Where ambiguity truly exists, "the court should generally construe it against the drafter." *Id*. (citing *Central Realty Co. v. Clutter*, N.E.2d 515, 517 (1980); *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 798 (6th Cir. 2003)).

Where a "contract is silent, as opposed to ambiguous, with respect to a particular matter[,]" the parties "are required to use good faith to fill the gap[.]" *Id.* at 764. Good faith imposes a contractual duty upon the parties to not "take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Id.*; *see also Ziegler v. Findlay Indus., Inc.*, 464 F. Supp. 2d 733, 740 (N.D. Ohio 2006) (citing *Ed Schory & Sons, Inc. v. Francis*, 662 N.E.2d 1074, 1082-83 (1996)). "[T]he implied covenant of good faith and fair dealing 'means only that . . . when a contract is susceptible to a fraudulent interpretation as well as an honest one, the latter should be presumed,' and that the covenant is not an independent basis for a cause of action." *Thomasville Furniture Indus., Inc. v. JGR, Inc.*, 3 F. App'x 467, 472 (6th Cir. 2001) (citation omitted); *see also Patrick v. CitiMortgage, Inc.*, 676 F. App'x 573, 577 (6th Cir. 2017) (stating that "Ohio law recognizes only a breach of contract claim; it does not recognize a free-standing or independent claim for breach of the covenants of good faith and fair dealing"). Thus, "no separate tort cause of action exists for breach of good faith apart from a breach of such contract." *Eggert Agency, Inc. v. N.A. Mgmt. Corp.*, No. C2-07-1011, 2008 WL 3474148, at *3 (S.D. Ohio Aug. 12, 2008).

The implied duty of good faith applicable to parties to a contract "does not supplant express contract terms." *Fifth Third Mortg. Co. v. Chicago Title Ins. Co.*, 758 F. Supp. 2d 476, 485 (S.D. Ohio 2010). Further, "[a] party does not state an independent claim for relief for breach of an implied covenant when an expressed term of the contract covers the specific matter." *Eggert*, 2008 WL 3474148, at *5 (citing *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 714 N.E.2d 898 (Ohio 1999); *McClorey v. Hamilton Cty. Bd. of Elections*, 720 N.E.2d 954 (Ohio Ct. App. 1998); *Jost v. Burr*, 590 N.E.2d 828 (Ohio Ct. App. 1990)).

Here, Melissa argues that she was to be paid $692,261.10 in termination payments by Allstate under the EA Agreement, but received only $317,286.31 because Allstate ceased making

monthly payments on the basis of an alleged breach of the EA Agreement. *Id*. at 5056-57. Melissa contends there is no evidence of her breach and, therefore, that Allstate's failure to make all required termination payments amounts to a breach on its part.[5] As she recognizes, Melissa's breach of contract claims turn on whether: (1) she solicited Allstate customers; (2) she used confidential information; and (3) a breach on her part obviates Allstate's obligation to make termination payments. *Id*. at PageID 5055-61.

### 1. Solicitation

The Court first addresses Melissa's contention that no admissible evidence shows she solicited customers in violation of the EA Agreement. As noted above, during the time the EA Agreement was in effect, Melissa was prohibited from "either directly or indirectly, solicit[ing], sell[ing], or service[ing] insurance of any kind for any other company, agent, broker, or refer a prospect to another company, agent, or broker." Doc. 195-2 at PageID 5696. Following termination of the EA Agreement, Melissa was prohibited from soliciting "the purchase of products or services in competition with those sold by [Allstate]" with regard to two categories of Allstate customers: (1) those she sold Allstate products to; and (2) those whose identity she discovered using Allstate confidential information. *Id*. at PageID 5703.

Of significance in determining whether Melissa violated the EA Agreement is the definition of the word "solicit." Unfortunately, the parties do not attempt to define the term in their briefing and the undersigned does not find the term specifically defined in EA Agreement. Courts have defined "solicit" as: "[t]he act or an instance of requesting or seeking to obtain

---

[5] In their reply memorandum, Melissa and Phoenix argue that "Allstate breached the contract by failing to provide Melissa sufficient time to sell her book of business" and that "Allstate breached the contract by violating its duty of good faith when it impeded Melissa's sale of her book of business[.]" Doc. 207 at PageID 6517. Such arguments were not raised in their motion for summary judgment (doc. 185) and, therefore, the Court does not address them here. *Ross v. Choice Hotels Int'l, Inc.*, 882 F. Supp. 2d 951, 958 (S.D. Ohio 2012) (stating that "a reply brief is not the proper place to raise an issue for the first time").

something; a request or petition[,]" *Welsco, Inc. v. Brace*, No. 4:12-CV-00394-KGB, 2014 WL 4929453, at *18 (E.D. Ark. Sept. 30, 2014) (citing Black's Law Dictionary (9th ed. 2009)); or "[a]n attempt or effort to gain business[.]" *Maverick Grp. Mktg., Inc. v. Worx Envtl. Prod., Ltd.*, 659 F. App'x 301, 309 (6th Cir. 2016).

Defendants suggest that business is not solicited if the customer, and not the agent, makes the initial contact and there is some authority supportive of that proposition. *See Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*, 893 F. Supp. 2d 761, 774 (E.D. Va. 2012), *aff'd*, 533 F. App'x 200 (4th Cir. 2013) (applying Georgia law and collecting cases); *Acuity Brands, Inc. v. Bickley*, No. CV 13-366-DLB-REW, 2017 WL 1426800, at *23 (E.D. Ky. Mar. 31, 2017). However, other courts have held that "a per se rule vis-à-vis initial contact has no place in this equation." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 11 (1st Cir. 2013); *Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1112 (D. Colo. 2016) (declining the "invitation to assign talismanic importance to initial contact"). Instead, such courts find that "initial contact is just one factor among many that should be considered in determining whether Defendants engaged in prohibited 'solicitation.'" *Wells Fargo*, 276 F. Supp. 3d at 1112. This Court finds that the term "solicit" means to request a business relationship and that, while the initial contact is a relevant consideration, the key question is the party first raising the prospect of a business relationship.

With such definition in mind, the undersigned must determine whether, viewing the evidence in a light most favorable to Allstate, reasonable minds could conclude that Melissa "solicited" Allstate customers in violation of the EA Agreement. In opposing Melissa's motion, Allstate points to numerous email messages reporting purported solicitation efforts undertaken by Melissa and/or Mike. *See* doc. 196 at PageID 6081. Melissa argues that these emails cannot be considered by the Court for purposes of summary judgment because they are inadmissible hearsay. Doc. 185 at PageID 5057-58. In support of such a contention, Melissa cites no authority, not even

the appropriate Federal Rules of Evidence, defining hearsay evidence and governing the admissibility of hearsay evidence. *See* doc. 185 at PageID 5057-58; *see, e.g.,* Fed. R. Evid. 801; Fed. R. Evid. 802.

Nevertheless, Allstate concedes that the emails are hearsay for the purposes with which it seeks to use them as evidence on summary judgment, but argues that they are admissible under the business records exception, Fed. R. Evid. 803(6).[6] *See* doc. 196 at PageID 6090 n.10. Allstate, like Melissa, presents no developed argument in this regard and cites no case law in support of such an assertion. *Id.* Because Allstate makes no effort to set forth a developed argument with regard to Evidence Rule 803(6), the undersigned declines to consider such email evidence at the summary judgment stage in light of Allstate's concession that such evidence is hearsay. *See McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997).

Nevertheless, even without consideration of the emails, the undersigned finds that evidence of record supports a conclusion that Melissa solicited Allstate customers in violation of the EA Agreement. In fact, it is undisputed that Melissa hung a sign on the door of the Papanek Agency after receiving the 90-day notice of termination from Allstate. *See* doc. 158 at PageID 3401. The sign read:

> The Papanek Agency
>
> Thanks You for your business
>
> Mike & Melissa are opening an Independent Insurance Agency at their previous North Dixie location, 3801 North Dixie, in January.

---

[6] Fed. R. Evid. 803(6) sets forth an exception to the general inadmissibility of hearsay evidence, as set forth in Fed. R. Evid. 802, for records of a regularly conducted activity. Such a record can be admitted upon satisfactorily showing that: (1) "the record was made at or near the time by -- or from information transmitted by -- someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; (3) "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with [Evidence] Rule 902(11) or (12) or with a statute permitting certification"; and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

If you have any questions you can reach Mike & Melissa at 937-781-6717

Thank you for your business.

Doc. 195-25 at PageID 5995. Without dispute, the phone number on the sign was Melissa's cell phone number. Doc. 158 at PageID 3401. While Melissa suggests that such sign does not amount to a solicitation under Ohio law, she cites no authority in support of such a proposition. The undersigned finds that, based upon the definition of "solicit" set forth above, the sign constitutes a solicitation of Melissa's Allstate customers. Thus, the Court, as a matter of law, finds, based on this undisputed evidence, that Melissa solicited customers in violation of the EA Agreement.

In addition to this undisputed evidence, disputed evidence of record, viewed in a light most favorable to Allstate, creates a genuine issue of material fact regarding Melissa's solicitation of Allstate customers in violation of the EA Agreement. For instance, Allstate customer Rebecca Oldiges testifies that Mike called and left a voicemail message for her in May 2015 (*i.e.*, during the non-solicitation period) asking if she had any insurance needs he could assist her with. Doc. 154 at PageID 3154-57, 3197; doc. 195-31 at PageID 1614.[7] There is no dispute that the Papanek Agency sold to Oldiges certain Allstate insurance products, and that Oldiges was an Allstate customer at the time of Melissa's termination. *See* doc. 195-31 at PageID 6013-14. Such evidence creates a genuine issue of material fact regarding whether Melissa further violated the non-solicitation provision of the EA Agreement.[8]

---

[7] Melissa takes issue with the fact that the sworn statement presented by Rebecca Oldiges is not notarized. However, such document need not be notarized if, as here, it is otherwise in compliance with 28 U.S.C. § 1746, *i.e.*, "is subscribed by him [or her], as true under penalty of perjury, and dated[.]" *See Bauer v. Singh*, No. 3:09-CV-194, 2010 WL 5088126, at *6-7 (S.D. Ohio Dec. 7, 2010) (citing *Thomas v. Harvey*, 381 F. App'x 542, 546 (6th Cir. 2010)).

[8] Allstate also points to Melissa's cell phone call records produced during discovery showing that, during the non-solicitation period, she contacted numerous customers she purportedly serviced as an Allstate agent. *See* doc. 196 at PageID 6082-83 n.4; *see also* doc. 196-9.

## 2.    Use of Confidential Information

Without dispute, the EA Agreement in this case permitted Melissa's use of Allstate's confidential information, but "only for the purposes of carrying out the provisions of [the EA Agreement]." Doc. 195-2 at PageID 5699. In other words, Melissa was prohibited from using Allstate confidential information for anything other than the "soliciting, selling and servicing insurance and other [Allstate] [b]usiness[.]" Doc. 195-2 at PageID 5697, 5699.

Perhaps the most significant evidence regarding Melissa's purported use of Allstate confidential information is the aforementioned undisputed fact that she was angry with Allstate and, at least at times, specifically wanted to -- and intended to -- take customers away from Allstate. *See, e.g.,* doc. 158 at PageID 3379; doc. 196-1 at PageID 6109-11. According to Melissa, however, she never actually "used" the confidential information after she printed it and, instead, shredded all of the documents. *Id.*

A significant legal question then, is whether merely printing Allstate customer information with the intent to solicit them away from Allstate amounts to "use" of confidential information. Neither party defines the term "use," though other decisions within this district, interpreting Ohio law, have found the plain and ordinary meaning of such term is "the act or practice of using something." *Skinner v. Guarantee Tr. Life Ins. Co.*, 813 F. Supp. 2d 865, 869 (S.D. Ohio 2011). "To use something, is 'to put into action or service[.]'" *Id.* The undersigned concludes that Melissa's mere printing of confidential information with the intent to solicit customers does not amount to "use" as that term is used in the EA Agreement. "Use" of confidential information did not occur until Melissa did something with the information, such as, *inter alia*, contacting an Allstate customer to solicit them.

However, such undisputed facts considered in combination with other disputed facts creates an issue of fact as to whether Melissa ultimately did use confidential information to solicit

Allstate customers. Such disputed facts include evidence that Melissa, or someone on her behalf, did ultimately contact Allstate customers to solicit their business for her new agency. *See, e.g.,* doc. 195-31 at PageID 1614; doc. 154 at PageID 3154-57, 3197. In addition, Allstate points to evidence that over 200 of the Papanek Agency's Allstate customers ultimately transferred insurance to Phoenix within a year-and-a-half of its opening. *See* doc. 196-5 at PageID 6200-02. Based upon all of the foregoing, a reasonable juror could infer that Melissa used confidential information to contact and solicit her former Allstate customers.

### 3. Allstate's Termination Payment Obligation

Melissa also argues that, even assuming she breached the EA Agreement, Allstate was not permitted to withhold termination payments indefinitely and, instead, was required to reinstate such payments upon her cure of any alleged breach. *See* doc. 185 at PageID 5056. Allstate, on the other hand, argues that Melissa's breach of the confidentiality and non-solicitation provisions relieved it of its obligation to make any further termination payments. Doc. 196 at PageID 6085.

In support of its contention, Allstate cites a recent case from the Northern District of Illinois, in which that Court agreed with the legal proposition Allstate advances. *See Ziegler v. Allstate Ins. Co.*, No. 16-CV-869, 2018 WL 1184738, at *6-7 (N.D. Ill. Mar. 7, 2018). The *Ziegler* case, however, differs somewhat from this case because there the EA Agreement included a specific provision stating that, in the event the agent breaches the EA Agreement, Allstate "shall be entitled to withhold remaining monthly [termination payment] installments, if any, and to receive from you liquidated damages in an amount equal to 100 percent of the total amount already paid to you[.]" *Id.* at *7. No such provision exists in the EA Agreement here. *See* doc. 195-2. Thus, the *Ziegler* case, while persuasive based upon the facts presented there, is distinguishable from the circumstances in this case.

Under Ohio law, "[a] breach of one of several terms in a contract does not discharge the obligations of the parties to the contract, unless performance of that term is essential to the purpose of the agreement." *Kersh v. Montgomery Developmental Ctr., Ohio Dep't of Mental Retardation & Developmental Disabilities*, 519 N.E.2d 665, 668 (Ohio Ct. App. 1987). "Stated another way, default by a party who has substantially performed does not relieve the other party from subsequent performance." *O'Brien v. Ohio State Univ.*, No. 06AP–946, 2007 WL 2729077, at *27 (Ohio Ct. App. Sept. 20, 2007). Materiality of a breach is determined by considering:

> the extent to which the injured party will be deprived of the expected benefit, the extent to which the injured party can be adequately compensated for the lost benefit, the extent to which the breaching party will suffer a forfeiture, the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has acted with good faith and dealt fairly with the injured party.

*LaSalle Bank Nat'l Ass'n v. Belle Meadows Suites L.P.*, No. 23766, 2010 WL 3195773, at *7 (Ohio Ct. App. Aug. 13, 2010). Materiality of a breach "is generally a question of fact." *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 731 (S.D. Ohio 2006); *DeBoer Structures (U.S.A.), Inc. v. Shaffer Tent and Awning Co.*, 233 F. Supp. 2d 934, 956 (S.D. Ohio 2002).

Such issue being one of fact, the Court cannot make an appropriate finding in this regard on summary judgment. Instead, the materiality of Melissa's breach[es] of the EA Agreement is an issue for determination by a jury.

Based upon all of the foregoing, Melissa's motion for partial summary judgment with regard to her counterclaims is **DENIED**.

### B.     Melissa's and Phoenix's Motion on Allstate's Claims

Additionally, Melissa and Phoenix also seek summary judgment on all claims asserted by Allstate in its first amended complaint, *id*. at PageID 5061, namely claims alleging: (1) breach of contract against Melissa; (2) misappropriation of trade secrets against all Defendants; (3) tortious interference with contractual relationships against Phoenix; (4) tortious interference with business

18

relationships against all Defendants; and (5) unfair competition against all Defendants. Doc. 22. Based upon the foregoing, *supra*, the Court finds genuine issues of material fact remain with regard to the breach of contract claims.

Insofar as Melissa and Phoenix seek summary judgment on Allstate's claims alleging misappropriation of trade secrets, tortious interference, and unfair competition, the undersigned notes that they present not a single citation of authority in support of their request in this regard and, therefore, their motion is also **DENIED**. *See Cent. Transp., LLC v. Balram Trucking, Ltd*, No. 3:15-CV-265, 2017 WL 680511, at *3 (S.D. Ohio Feb. 21, 2017) (denying summary judgment where the parties failed to cite legal authority in support of their arguments); *Hindman v. Thompson*, 557 F. Supp. 2d 1293, 1300 (N.D. Okla. 2008) (stating that it is not "the Court's job to . . . research arguments on [a party's] behalf"); *see also* S.D. Ohio Civ. R. 7.2(a) (stating that "[a]ll motions . . . shall be accompanied by a memorandum in support thereof that shall be a brief statement of the grounds, with citation of authorities relied upon").

## ALLSTATE'S MOTION FOR SUMMARY JUDGMENT (DOC. 195)

The Court next addresses Allstate's motion for summary judgment on the counterclaims asserted by Melissa and Phoenix (doc. 195), counterclaims in which they allege: (1) breach of contract; (2) tortious interference with contractual and business relationships; (3) violations of Ohio's Deceptive Trade Practices Act ("ODTPA"); (4) breach of the covenant of good faith and fair dealing; and (5) unfair competition.

Melissa Papanek and Phoenix present no opposition to Allstate's motion as it relates to counterclaims alleging violations of the ODTPA and unfair competition and, therefore, such claims have been abandoned and are **DISMISSED** with prejudice. *See Swann v. Time Warner Entm't Co., L.P.*, 126 F. Supp. 3d 973, 982 (S.D. Ohio 2015) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (finding that "[t]he district court properly declined to

19

consider the merits of [plaintiff's] claim because [plaintiff] failed to address it in . . . his response to the summary judgment motion"); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (holding that the district court properly concluded that plaintiff abandoned claims where his opposition to summary judgment "did not properly respond to the arguments asserted" by defendant); *Conner v. Hardee's Food Sys., Inc.*, 65 F. App'x 19, 24 (6th Cir.2003) (concluding that plaintiff abandoned a claim where he "failed to brief the issue before the district court")).

### A.        Breach of Contract

Allstate argues that summary judgment is proper on the counterclaims asserted by Melissa insofar as she asserts that Allstate breached the EA Agreement by: (1) shutting down the Papanek Agency on October 31, 2014, *i.e.*, prior to the December 1, 2014 termination of the EA Agreement; and (2) not continuing to make termination payments to her after November 4, 2015.  Doc. 195 at PageID 5662-66.  As set forth, *supra*, issues of fact remain regarding Allstate's obligation to make termination payments and, therefore, Allstate's motion should be denied with regard to such argument.

### 1.        Shut Down of the Papanek Agency on October 31, 2014

With regard to Allstate's act of shutting down the Papanek Agency on October 31, 2014, *i.e.*, prior to the termination date of the EA Agreement on December 1, 2014, the Court notes, pursuant to the EA Agreement, that Allstate, upon giving Melissa 90-days written notice of termination, possessed the contractual right to require her to "cease to act or represent [her]self in any way as an agent or representative of [Allstate][.]"  Doc. 195-2 at PageID 5703.  Thus, once the 90-days written notice was given, Allstate had the contractual right to require that Melissa cease acting as an Allstate agent by merely requesting that she do so.  *Id*.  At issue here is whether or not Allstate made the required request.

There is no dispute that, on October 31, 2014, Allstate representatives Ted Stefanov and Cathy Fouty arrived at the Papanek Agency, read the termination letter previously issued on September 2, 2014 and "shut [the Agency] down." Doc. 198-2. Melissa Papanek argues that reading the September 2, 2014 termination letter on October 31, 2014 was not a sufficient request to cease acting as an Allstate representative on that date because the language of that letter read out loud on October 31st states that she was to cease acting as an Allstate agent "[u]pon the termination of [the EA Agreement]," *i.e.*, December 1, 2014. Doc. 198-5 at PageID 6359. Despite Melissa's arguments, however, she nevertheless testified regarding her clear understanding that, on October 31, 2014, Allstate "shut [her] down" as of that date. Doc. 198-2. In light of such testimony, no reasonable jury could conclude that Allstate failed to act sufficiently under the EA Agreement in requesting, and thus obligating, Melissa to "cease to act or represent [her]self in any way as an agent or representative of [Allstate]" on October 31, 2014. Doc. 195-2 at PageID 5703. Accordingly, summary judgment is **GRANTED** in favor of Allstate in this regard.

### 2. Failure to Give 90-Days to Sell the Book of Business

In their memorandum in opposition to Allstate, Melissa argues that Allstate breached the EA Agreement by failing to give her a full 90-days to sell her book of business. *See* doc. 198 at PageID 6310-11. They argue that the IC Manual provided Melissa 90-days to sell her book of business, with the 90 days commencing at the time she received both the notice of termination and the request to cease acting as an Allstate agent. *Id*. Thus, they argue that, assuming Allstate requested Melissa to cease acting as an Allstate agent on October 31, 2015, her 90 days to sell her book of business did not end until January 1, 2015, at the earliest. *Id*.

In response, Allstate contends that such claim was not raised in this case prior to Melissa's opposition to Allstate's motion for summary judgment and, therefore, it should not be considered in this case. Doc. 209 at PageID 6597. The Court, in reviewing Melissa's counterclaim alleging

breach of contract, agrees with Allstate in this regard. *See* doc. 33 at PageID 408-12. Non-moving parties "may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)).

Even considering Melissa's argument in this regard, the Court finds it has no merit. The specific portion of the IC Manual referenced by Melissa in her motion specifically states that economic interest must be transferred "to an approved buyer within 90 days of the notice of termination of the [EA Agreement] (or such longer period within [Allstate's] discretion[.])" Doc. 158-1 at PageID 3531 (SEALED). The Court finds no ambiguity in this provision and, since the notice of termination was given on September 2, 2014, Melissa's deadline for transferring her economic interest in her book of business expired on December 1, 2014.

### 3.        Good Faith and Fair Dealing

Melissa also argues that Allstate breached the covenant of good faith and fair dealing, and thus the EA Agreement, by impeding her ability to sell her book of business. Doc. 198 at PageID 6317-19. Specifically, she argues that Allstate breached such covenant by, *inter alia*, failing to compile a list of potential buyers; failing to list her business on a particular website where books of business were listed for sale; informing another exclusive agent that he would receive half the book at no cost if she failed to sell her interest; and setting unreasonable deadlines for the submission of materials for approval.

With regard to allegations that Allstate failed to compile a list of potential buyers and failed to list her business on a particular website, Melissa points to no specific provision in the EA Agreement (or documents incorporated into such agreement) requiring Allstate to assist her in finding a buyer. Allstate, on the other hand, points to a specific provision in the IC Manual stating

that, "[i]n sale of agency situations, Allstate is never the buyer or seller" and that "[t]he only times Allstate is involved is to approve the buyer[.]"  Doc. 158-1 at PageID 3535.  Accordingly, insofar as Melissa alleges Allstate breached the covenant of good faith and fair dealing by not helping her find a buyer, summary judgment in favor of Allstate is appropriate on such claim.

With regard to the remaining allegations, Allstate argues that such claims should fail because, pursuant to the EA Agreement, it retained "the right in its exclusive judgment to approve or disapprove" a transfer of Melissa's economic interest in her book of business.  Doc. 209 at PageID 6602.

Generally, with regard to satisfaction clauses in contracts, "the exercise of judgment must be in accordance with the duty of good faith and fair dealing[.]"  Restatement (Second) of Contracts § 228 (1981); *Hutton v. Monograms Plus, Inc.*, 604 N.E.2d 200, 204 (1992).[9]  "Whether parties have acted in good faith and have 'deal[t]' fairly and 'reasonably with each other' or have breached that obligation and acted in bad faith is a question of fact."  *Third Fed. S. & L. Ass'n of Cleveland v. Formanik*, 64 N.E.3d 1034, 1049 (Ohio Ct. App. 2016); *see also Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005).  There being material questions of fact remaining, the Court **DENIES** Allstate's motion for summary judgment on Melissa's breach of contract claim insofar as she alleges a breach of the covenant of good faith and fair dealing.

### B.     Tortious Interference

"The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another."  *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651

---

[9] Where, as here, the satisfaction clause "relates to matters involving . . . judgment, then a subjective standard is applied, and the test is whether the party is actually satisfied."  *Hutton*, 604 N.E.2d 204; *see also Wagner v. Anderson*, No. 2908, 1992 WL 302437, at *2 (Ohio Ct. App. Sept. 25, 1992).

N.E.2d 1283, 1294 (Ohio 1995). Significantly, the Court's finding of any genuine issue of material fact regarding breach of contract does not impact a finding with regard to tortious interference because "[a] breach of contract alone will not give rise to an action in tort, regardless of the tortfeasor's motive." *Castle Hill Holdings, LLC v. Al Hut, Inc.*, No. 86442, 2006 WL 726911, at *10 (Ohio Ct. App. Mar. 23, 2006).

"Under Ohio law, to prevail on a claim for tortious interference with a prospective business opportunity, a plaintiff must demonstrate: (1) the existence of the prospect of a business relationship; (2) that defendant knew of the plaintiff's prospective relationship; (3) that defendant intentionally and materially interfered with the plaintiff's prospective relationship; (4) without justification; and (5) caused plaintiff to suffer damages." *Chrvala v. Borden, Inc.*, 14 F. Supp. 2d 1013, 1023 (S.D. Ohio 1998); *see also Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1039 (Ohio Ct. App. 2015). Significantly, under Ohio law, one "cannot tortiously interfere with his [or her] own business relationship." *Dolan v. Glouster*, 879 N.E.2d 838, 848 (Ohio Ct. App. 2007); *see also Southward*, 98 F. Supp. 3d at 933. In other words, to state a claim for tortious interference, the alleged wrongdoer must be "a third-party to the alleged business relationship[.]" *Carter v. PJS of Parma, Inc.*, No. 1:15 CV 1545, 2016 WL 1316354, at *3 (N.D. Ohio Apr. 4, 2016).[10]

Here, with regard to the transfer of Melissa's economic interest in her Allstate book of business, the EA Agreement states that the transfer must be "to an approved buyer" and that Allstate "retains the right in its exclusive judgement to approve or disapprove such a transfer." Doc. 195-2 at PageID 5702. Further, and significantly, the EA Agreement states that a transfer of

_____

[10] In addition, with regard to the element of justification, "[o]ne who intentionally causes a third person not to enter into a prospective contractual relation with another in order to influence the other's policy in the conduct of his business does not interfere improperly with the other's relation if (a) the actor has an economic interest in the matter with reference to which he wishes to influence the policy of the other and (b) the desired policy does not unlawfully restrain trade or otherwise violate an established public policy and (c) the means employed are not wrongful." *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 662 N.E.2d 1088, 1092-93 (Ohio Ct. App. 1995).

Melissa's "interest in [the EA Agreement] will be conditioned upon the termination of [the EA Agreement] and the execution of a then current agency agreement by the proposed transferee." *Id*. In other words, any prospective business relationship Melissa Papanek had with a potential buyer of her book of business was also a prospective business relationship between Allstate and the potential buyer. Therefore, Allstate is not a third-party to the prospective business relationship and, accordingly, a claim of tortious interference against it cannot stand. *Cf. Cook v. Little Caesar Enters., Inc.*, 972 F. Supp. 400, 414 (E.D. Mich. 1997), *aff'd*, 210 F.3d 653 (6th Cir. 2000); *see also Hunt Enters., Inc. v. John Deere Indus. Equip. Co.*, 162 F.3d 1161 (6th Cir. 1998); *Blair v. Gen. Motors Corp.*, 838 F. Supp. 1196, 1200-01 (W.D. Ky. Dec. 15, 1993). Allstate's motion for summary judgment is **GRANTED** in this regard.

## MIKE PAPANEK'S MOTION FOR SUMMARY JUDGMENT

Mike seeks summary judgment on all of Allstate's claims on the basis that there is no evidence that he solicited Allstate customers or used Allstate confidential information in violation of his LSP Agreement. Doc. 124 at PageID 2588. In his motion for summary judgment, Mike summarizes a number of depositions of record, but cites no law in support of his claim. *See* doc. 124. He also argues that he cannot be liable for Allstate's claims because the one-year solicitation prohibition in his LSP Agreement ended on March 4, 2014, and all wrongdoing alleged by Allstate occurred after that date. Doc. 168 at PageID 4160.

In support of his contention that the non-solicitation period ended in March 2014, Mike points to a single email dated October 2, 2014, which states that he was voluntarily terminated on March 4, 2013. *See* doc. 160-2 at PageID 3995. However, Mike himself testified at his deposition that he remained employed at the Papanek Agency from the date Melissa took over in 2008 through the close of the Agency. Doc. 161 at PageID 4002. Thus, issues of fact remain with regard to the termination date of Mike's LSP Agreement.

The undersigned also finds genuine issues of material fact remain as to whether Mike solicited Allstate customers or used Allstate confidential information in violation of the LSP Agreement. *See supra*. Therefore, in light of all of the foregoing, Mike's motion for summary judgment (docs. 124, 168) is **DENIED**.

## IV.

In light of the foregoing the Court **ORDERS** as follows:

(1)      The parties' previously filed motions for summary judgment (docs. 176, 177) are **TERMINATED** on the docket;

(2)      Defendant Michael Papanek's motion for summary judgment (docs. 124, 168) is **DENIED**;

(3)      The motion for summary judgment filed by Defendants Melissa Papanek and Phoenix (doc. 185) is **DENIED**;

(4)      Plaintiff Allstate's motion for summary judgment (doc. 185) is **DENIED** as it relates to counterclaims alleging breach of contract and breach of the covenant of good faith, and is **GRANTED** with regard to all other counterclaims asserted by Defendants Melissa Papanek and Phoenix;

(5)      Defendants' motion for leave to supplement the record on summary judgment (doc. 218) is **GRANTED**;

(6)      The parties' motions for leave to file documents under seal (docs. 205, 208) are **GRANTED**.

**IT IS SO ORDERED.**

Date:  July 23, 2018                          s/ Michael J. Newman
                                                      Michael J. Newman
                                                      United States Magistrate Judge