UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

ALLSTATE INSURANCE COMPANY,

      Plaintiff,                            Case No. 3:15-cv-240

vs.

MELISSA PAPANEK, *et al.*,               Magistrate Judge Michael J. Newman
                                     (Consent Case)
      Defendants.

---

**DECISION AND ENTRY: (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO RECONSIDER SUMMARY JUDGMENT (DOC. 303); (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO RECONSIDER SUMMARY JUDGMENT (DOC. 305); (3) DEFERRING A RULING ON PLAINTIFF'S MOTION FOR SANCTIONS UNTIL AFTER TRIAL (DOC. 224); AND (4) DENYING DEFENDANTS' MOTION FOR SANCTIONS (DOC. 249)**

---

This civil consent case arising under the Court's diversity jurisdiction, *see* 28 U.S.C. § 1332, concerns, *inter alia*, breach of contract claims following the termination of an exclusive agent agreement ("EA Agreement') between Allstate Insurance Company ("Allstate") and its former exclusive agent Melissa Papanek ("Papanek"). Phoenix Insurance and Financial Group, LLC ("Phoenix"), an independent insurance agency founded by Papanek following her termination from Allstate, is also a Defendant in the case. Melissa's father, Michael Papanek, who was Melissa's employee both while she remained an Allstate exclusive agent and after she founded Phoenix, was previously a Defendant in this case, but has been voluntarily dismissed by Allstate. Docs. 256, 278.

This case is presently before the Court on the parties' cross-motions for sanctions (docs. 224, 229), as well as the parties' second cross-motions for summary judgment (docs. 303, 305) -- motions for summary judgment that the Court, for the reasons set forth herein, construes as motions

for reconsideration of summary judgment. The Court has carefully considered the foregoing, including all opposition and reply memoranda, and these motions are now fully briefed and ripe for decision.

## I.

Allstate filed this action against Defendants on July 6, 2015. Doc. 1. The operative pleadings before the Court now are Allstate's first amended complaint (doc. 22) and the first amended answer and counterclaim by Melissa Papanek and Phoenix (doc. 34). In the first amended complaint, Allstate asserted the following claims: (1) breach of contract against Melissa Papanek; (2) breach of contract against Mike Papanek; (3) misappropriation of trade secrets against all three Defendants; (4) tortious interference with contractual relationships against Phoenix; (5) tortious interference with business relationships against all three Defendants; and (6) unfair competition against all three Defendants. Doc. 22.

Melissa Papanek asserted the following counterclaims against Allstate: (1) breach of contract; (2) tortious interference with contractual and business relationships; (3) violations of Ohio's Deceptive Trade Practices Act ("ODTPA"), Ohio Rev. Code § 4165.011 *et seq.*; (4) breach of the covenant of good faith and fair dealing; and (5) unfair competition. Doc. 34. Phoenix joined in Melissa's ODTPA and unfair competition counterclaims. *See* doc. 34 at PageID 458-61.

After engaging in a lengthy period of discovery, a period that initially closed on February 28, 2018 (doc. 131), the parties filed cross-motions for summary judgment and memoranda supported by voluminous exhibits and deposition transcripts (hereinafter referred to as the parties' first motions for summary judgment"). *See* docs. 124, 168, 185, 195. After a careful and detailed review of the evidence presented by the parties in support of their first motions for summary judgment, the Court set forth the material facts as follows:

## Contractual Relationship Between the Parties

In 1972, Mike opened an Allstate exclusive agency, which came to be called the Papanek Agency, at 4048 Colonel Glenn Highway in Beavercreek, Greene County. Doc. 161 at PageID 4001. In 2008, Melissa purchased Mike's economic interest in the Papanek Agency. Doc. 158 at PageID 3358-59. As part of the transfer of the Papanek Agency, Melissa entered into an exclusive agency agreement ("EA Agreement") with Allstate on August 13, 2008. Doc. 185-1 at PageID 5065-74. The EA Agreement authorized Melissa to sell Allstate insurance products and prohibited her from "either directly or indirectly, solicit[ing], sell[ing], or servic[ing] insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of [Allstate]." Doc. 195-2 at PageID 5696.

After selling his economic interest to Melissa, Mike continued selling insurance for the Papanek Agency as a Licensed Service Provider ("LSP"),[1] and executed an LSP Agreement with the Papanek Agency on October 26, 2008. Doc. 130 at PageID 2639; doc. 130-2 at PageID 2700-01. Allstate was a third-party beneficiary of the LSP Agreement, an agreement in which Mike agreed to "not, either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker without the prior written consent of [Allstate]." *Id.*

Both Melissa's EA Agreement and Mike's LSP Agreement provided for the protection of Allstate's confidential information. Melissa's EA Agreement provided that confidential information, such as "the names, addresses, and ages of [Allstate] policyholders[,]" were "wholly owned" by Allstate. Doc. 195-2 at PageID 5697, 5699. Melissa, however, was permitted "use" of such confidential information, but "only for the purposes of carrying out the provisions of [the contract]," *i.e.*, "soliciting, selling, and servicing insurance and other [Allstate] Business[.]" *Id.* Substantially similar provisions were set forth in Mike's LSP Agreement. *See* doc. 130-2 at PageID 2700.

## Termination of the Relationship Between the Parties

In March of 2013, Mike suffered a stroke; he did not work during his recovery. Doc. 182 at PageID 4746. According to Allstate records, the Papanek Agency terminated Mike's LSP Agreement on March 4, 2013 after he suffered the stroke. Doc. 160 at PageID 3995. However, by November 2013, Mike's health had substantially improved, and he returned to his job as an LSP at the Papanek Agency. Doc. 182 at PageID 4746. The parties point to no evidence, however,

---

[1] LSPs assist Exclusive Agents by "receiving and accepting applications for insurance" and "selling certain specified [Allstate] products" to customers in the Exclusive Agency's market. Doc. 130-2 at PageID 2700.

that Mike executed a subsequent LSP Agreement upon his return in November 2013.

Melissa's EA Agreement was terminable by either her or Allstate, "with or without cause, upon providing ninety (90) days prior written notice to the other" party. *Id*. at PageID 5703. On September 2, 2014, Allstate exercised its right under the EA Agreement and, both in person and in writing, notified Melissa that it was terminating the EA Agreement effective December 1, 2014. Doc. 195-3 at PageID 5707-08; doc. 195-4 at PageID 5710. According to Allstate, it exercised its right to terminate Melissa's EA Agreement because she admitted to improperly issuing auto and homeowners policies without the customers' knowledge; intentionally refusing to remove vehicles from customers' auto policies; and delaying cancellation of certain policies until after December 2013 in order to receive year-end bonuses. Doc. 195-4 at PageID 5710.

### Rights and Duties Upon Termination

Under the EA Agreement, Melissa was permitted to "transfer [her] entire economic interest in the business written under [the EA Agreement] . . . by selling the economic interest in the business to an approved buyer." *Id*. at PageID 5702. Upon notifying Melissa of termination, Allstate reminded her of her ability to sell her economic interest so long as the sale occurred by the termination date of December 1, 2014. Doc. 198-5 at PageID 6359. Under the EA Agreement, however, Allstate "retain[ed] the right in its exclusive judgment to approve or disapprove such a transfer." *Id*. Notably, "[a]pproval of a proposed transfer" was "conditioned upon[,]" *inter alia*, "the execution of a then current agency agreement by the proposed transferee." *Id*. Melissa was unable to sell her economic interest and, according to her, Allstate impeded her efforts in that regard despite interested purchasers. *See* doc. 198 at PageID 6317-18.

Pursuant to the EA Independent Contractor Manual, which was made part of the EA Agreement between the parties, in the event Melissa was unable to sell her economic interest, she could "elect to receive [a] termination payment, subject to the terms and conditions of the [EA] Agreement[.]" Doc. 158-1 at PageID 2538 (SEALED). Pursuant to the Supplement to the EA Agreement, which was also incorporated as part of the contract between the parties, termination payments "are subject to compliance with the terms of the confidentiality and non-competition provisions of the [EA Agreement], which survive termination of the agreement." Doc. 158-1 at PageID 3553 (SEALED). Ultimately, Melissa accepted the termination payments; a dispute exists as to whether such choice was voluntary or whether such choice was forced upon her by Allstate. Doc. 195-23 at PageID 5991; doc. 195-24 at PageID 5993.

In addition to the foregoing, upon termination of the EA Agreement, Melissa Papanek was required to, *inter alia*, "immediately return all property belonging

to [Allstate], or dispose of it in such manner as the Company specifie[d]" and "immediately cease" using all telephone numbers used to conduct business under the EA Agreement. Doc. 195-2 at PageID 5703. Further, for "one year following termination" of the contract, Melissa Papanek was also prohibited from "solicit[ing] the purchase of products or services in competition with those sold by [Allstate]" to certain people, companies, or organizations who were Allstate customers at the time of termination. Doc. 195-2 at PageID 5704. Specifically, Melissa Papanek could not solicit Allstate customers that: (1) she or anyone working on her behalf sold Allstate products to; or (2) whose identity was discovered because of access to Allstate confidential information. *Id.* Finally, upon termination of the agreement, Melissa Papanek agreed not to solicit the purchase of products in competition with Allstate products within a mile of the office in which she sold Allstate products during the contract period. *Id.* at PageID 5704. Mike's LSP Agreement had similar prohibitions. Doc. 130-2 at PageID 2700-01.

### Papanek Conduct Immediately Following the Notice of Termination

Upon receiving the 90-day notice of termination from Allstate on September 2, 2014, Melissa's reaction was to "get Allstate" and she discussed with employees of the Papanek Agency her desire to solicit Allstate customers away to her independent agency. *See* doc. 158 at PageID 3379. Almost two months later, in late October 2014, Melissa spent ten to twelve hours a day, for four straight days, printing confidential information for hundreds of Allstate customers with the specific intent of using such confidential material to solicit them for her new insurance agency. Doc. 196-1 at PageID 6109-11. In fact, Melissa admits she printed the voluminous amount of confidential information intending "to take back the book" from Allstate. *Id.* at 6111. Melissa acknowledges that printing the confidential information was "a bad decision" and testified in her deposition that, upon realizing her actions were wrong, she shredded the documents. *Id.* at 6110.

It is also undisputed that Papanek hung a sign on the door of the Papanek Agency after receiving the 90-day notice of termination from Allstate. *See* doc. 158 at PageID 3401. The sign on the door read:

> The Papanek Agency
>
> Thanks You for your business
>
> Mike & Melissa are opening an Independent Insurance Agency at their previous North Dixie location, 3801 North Dixie, in January.
>
> If you have any questions you can reach Mike & Melissa at 937-781-6717

Thank you for your business.

Doc. 195-25 at PageID 5995. Without dispute, the phone number on the sign was Melissa Papanek's cell phone number. Doc. 158 at PageID 3401.

In addition to these undisputed facts, Allstate points to other, albeit disputed facts, that Melissa was accumulating Allstate customer information and even contacting Allstate customers to inform them of potentially cheaper rates beginning on December 1, 2014, *i.e.*, following her termination as an Allstate agent. *See* doc. 195-1 at PageID 5655-56.

According to Allstate, after learning of Melissa's activities showing -- or at least suggesting -- her intent to solicit Allstate customers following her termination as an Allstate agent in violation of the EA Agreement, Allstate representatives Ted Stefanov and Cathy Fouty arrived at the Papanek Agency on October 31, 2014, read the termination letter previously issued on September 2, 2014, and "shut [the Agency] down." Doc. 198-2. Notably, under the EA Agreement, Allstate possessed to contractual right, after giving Melissa Papanek 90-days written notice of termination, to require her to "cease to act or represent [her]self in any way as an agent or representative of [Allstate][.]" Doc. 195-2 at PageID 5703.

### Post-Termination

Following termination of the EA Agreement on December 1, 2014, Allstate began making termination payments to Melissa in January 2015. Doc. 185-9 at PageID 5098. Melissa opened Phoenix in January 2015 at a former Papanek Agency location on North Dixie Drive in Dayton, Ohio. Doc. 185 at PageID 5049. Allstate contends that Melissa solicited Allstate customers after opening Phoenix. *See* doc. 185-6 at PageID 5086-88. On May 15, 2015, Allstate sent Melissa's attorney a cease-and-desist letter. *See id.* In November 2015, Allstate began withholding installments of Melissa's termination payments because of the issues involved in this case. *See* doc. 185-8 at PageID 5096. Of the $692,261.10 of termination payments supposedly due and owing to Melissa, she has not been paid $374,974.79. Doc. 185-8 at PageID 5096; doc. 185-9 at PageID 5098.

Doc. 220 at PageID 6765-70.

After careful consideration of the arguments set forth in the parties' first motions for summary judgment, the Court denied the motion filed by Papanek and Phoenix in its entirety. Doc. 220. The Court granted summary judgment in favor Allstate on Papanek and Phoenix's

counterclaims alleging violations of ODTPA and unfair competition on the basis that Papanek and Phoenix abandoned those claims by not presenting opposition to Allstate's summary judgment arguments. *See* doc. 220 at PageID 6780. The Court also granted summary judgment in Allstate's favor on each breach of contract claim asserted against it except for Papanek's claim that Allstate breached the implied duty of good faith and fair dealing by allegedly impeding the sale of her book of business. *Id*. at 6783-84.

Following the ruling on summary judgment, this case was set to proceed to trial on September 17, 2018. However, on August 15, 2018, Allstate filed a motion for sanctions against Defendants and their counsel for producing numerous documents in the weeks before trial found in a folder within Papanek's email account. Doc. 224. Defendants countered with a cross-motion for sanctions arguing that Allstate spoliated evidence by erasing Ted Stefanov's cell phone when he purportedly turned it into Allstate at the time of his retirement in November 2017. Doc. 249.

At the final pretrial conference on September 7, 2018, the Court, in the interest of justice and with the agreement of counsel, reopened discovery with regard to the information belatedly produced by Defendants.[2] Docs. 281, 282. The Court also set a deadline for filing motions for summary judgment after the conclusion of the reopened discovery period -- albeit with the intention of revisiting the previous summary judgment decision only insofar as new evidence obtained during the reopened discovery period warranted reconsideration. In setting another deadline for filing summary judgment motions after the reopened discovery period, the Court did not intend to reconsider arguments that were, or should have been, made in moving for summary judgment the first time. To that end, the Court treats the cross-motions for summary judgment as akin to motions for reconsideration.

---

[2] The Court then permitted counsel for all parties to engage in limited discovery and closely supervised the parties and counsel during that period.

## II.

The Court will first address the parties' second motions for summary judgment, which the Court treats as motions for reconsideration of the previous summary judgment decision. "The Federal Rules of Civil Procedure do not explicitly address motions for reconsideration of interlocutory orders." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* The Court will address each of the issues presented by the parties, in turn, with a view to whether the arguments now advanced could have been advanced in the parties' initial motions for summary judgment and, if so, whether a clear error or manifest injustice would result by declining to consider those belated arguments.

### A.     Papanek's Breach of Contract Claim - Termination Provision

Papanek first argues that Allstate breached the EA Agreement when it only gave her until December 1, 2014 to sell her economic interest in her Allstate book of business and, instead, should have given her until January 29, 2015. Doc. 305 at PageID 8054. The undersigned addressed this issue in its Order on the parties' first motions for summary judgment, concluding that Papanek failed to raise this issue prior to filing her opposition to Allstate's summary judgment motion and, thus, such contention could not be considered. *See* doc. 220 at PageID 6782-83 (citing *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005). The undersigned also concluded that, assuming such argument had been preserved by Papanek, it had no merit. *Id.*

Thus, Papanek's second motion for summary judgment essentially seeks reconsideration of the Court's previous ruling in this regard. However, the undersigned finds that, based on the circumstances presented here, it is improper to reconsider the foregoing argument at this stage. Discovery was reopened, and an opportunity for further summary judgment proceedings resulted, because of Papanek's failure to timely produce documents in discovery. Doc. 281. Reconsidering the Court's previous ruling would, essentially, reward Papanek for her discovery failures and, therefore, it would not be just to now consider an argument that was not previously preserved for the Court's review. Papanek's motion for summary judgment is **DENIED** in this regard.

Again, however, even assuming, *arguendo*, that the argument was preserved, it has no merit. As noted above, the EA Agreement provides that agents possess "an economic interest . . . in [their] Allstate customer accounts developed under" the EA Agreement and an agent "may transfer [his or her] entire economic interest . . . upon termination of [the EA Agreement] by selling the economic interest in the business to an approved buyer." Doc. 185-1 at PageID 5071. Again, either party could terminate the EA Agreement between them, "with or without cause, upon providing ninety (90) days prior written notice to the other[.]" Doc. 185-1 at PageID 5072.

Focusing on these provisions alone, the time when an agent may sell his or her economic interest is "upon termination of" the EA Agreement. The word "upon" means: "on the occasion of"; "at the time of"; or "very soon after." MERRIAM-WEBSTER ONLINE, available at http://unabridged.merriam-webster.com/unabridged/upon (last visited Oct. 28, 2019); *see also Miles v. Fulton Bank*, No. 2:08CV202, 2008 WL 11444204, at *3 (E.D. Va. Sept. 30, 2008), *aff'd*, 329 F. App'x 395 (4th Cir. 2009). Thus, from the undersigned's perspective, focusing solely on the EA Agreement itself, without reference to documents incorporated therein, the time when Papanek could sell her economic interest in her book of business was "at the time of" or "very

soon after" termination of the EA Agreement, *i.e.*, on or very soon after December 1, 2014. Accordingly, Allstate did not breach the EA Agreement when, on September 2, 2014, it informed Papanek that, if she sought to sell her economic interest, any such sale must occur by the EA Agreement termination date of December 1, 2014. Doc. 198-5 at PageID 6359.

The terms of the Independent Contractor Manual ("Manual"), which are incorporated into the EA Agreement, do not change this conclusion. The Manual provides that, in the circumstance where, as here, Allstate gives a 90 day "notice of termination, with or without cause, and has requested that [the agent] immediately cease representing the Company[,]" the agent could "elect to transfer [his or her] interest in the book of business . . . to an approved buyer, or to receive [TPP][.]" Doc. 158-1 at PageID 3531.[3] Notably, neither the EA Agreement nor the Manual require that the notice of termination and the request to cease representing the Company occur simultaneously. The Manual further states that, "[i]f such election is not made or the economic interest is not transferred to an approved buyer within 90 days of *notice of termination* . . . the termination payment will be processed." *Id*. (emphasis added). Thus, by the express terms of the Manual, the time period in which an agent can elect between selling his or her book of business or receiving TPP commences on the date Allstate gives the agent the notice of termination.

Here, Allstate gave Papanek the notice of termination on September 2, 2014. Thus, under the provisions of both the EA Agreement and the Manual, Papanek could elect to receive TPP or complete the sale of her economic interest in her book of business on or before December 1, 2014. If she did not complete the sale on or before December 1, 2014, then Papanek's only option was

---

[3] The Manual sets forth no further guidelines regarding the sale of an agent's economic interest in the circumstance where Allstate has given notice of termination but makes no request that the agent cease representing Allstate. From the undersigned's perspective then, in such circumstance, the terms of the EA Agreement alone applies and, thus, an agent "may transfer [his or her] entire economic interest . . . upon termination of [the EA] Agreement by selling the economic interest in the business to an approved buyer." Doc. 185-1 at PageID 5071.

to receive TPP -- unless she otherwise materially breached the EA Agreement. Nevertheless, on October 31, 2014, Papanek concedes she informed Allstate that she would take TPP. Doc. 198 at PageID 6319; doc. 195-23 at PageID 5991. Accordingly, Allstate did not breach the agreement between the parties by giving Papanek until December 1, 2014 to sell her book of business.

### B. Good Faith and Fair Dealing

All parties now seek reconsideration of the Court's conclusion regarding Papanek's claims that Allstate breached the covenant of good faith and fair dealing. In deciding the issue previously, the undersigned concluded that Allstate had no contractual obligation to assist Papanek in finding a buyer for the economic interest in her book of business, but concluded that genuine issues of material fact remained as to whether Allstate acted in good faith with regard to approving or disapproving potential buyers of Papanek's book of business and in setting deadlines for submitting potential buyers for approval.

Now, Papanek moves for summary judgment in her favor on these claims despite not doing so originally. *See* doc. 305 at PageID 8055-58. In addition, Allstate again moves for summary judgment on Papanek's counterclaim asserting breach of the covenant of good faith and fair dealing. In doing so, Allstate sets forth an argument and cites law not previously presented to the Court -- namely, that under Ohio law, the implied covenant of good faith and fair dealing does not apply where, as here, the contractual provision at issue provides one party with "the absolute and exclusive authority to make the decision at issue." Doc. 304 (citing *Great Water Capital Partners, L.L.C. v. Down-Lite Int'l, Inc.*, Nos. C0150015, C-150023, 2015 WL 7459284, at *3 (S.D. Ohio Nov. 18, 2015).

In fact, Allstate now cites a published Sixth Circuit opinion analyzing the same Allstate EA Agreement provision at issue here. *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 827 (6th

Cir. 2003). There, the Sixth Circuit concluded that the implied covenant of good faith and fair dealing did not attach to Allstate's "exclusive judgment to approve or disapprove" of a transfer. *Id*. Although *Stephenson* applied Michigan law in interpreting the contract claims at issue there, Ohio courts have applied its holding when analyzing contracts under Ohio common law. *See DavCo Acquisition Holding, Inc. v. Wendy's Int'l, Inc.*, No. 2:07-CV-1064, 2008 WL 755283, at *6-7 (S.D. Ohio Mar. 19, 2008); *Great Water Capital Partners, L.L.C.*, 2015 WL 7459284, at *3. Accordingly, it appears that Ohio law and Sixth Circuit authority bar Papanek's good faith and fair dealing counterclaims as a matter of law.

Finding that a manifest injustice would occur by permitting a meritless claim to proceed to a jury trial, the undersigned **GRANTS** Allstate's request to reconsider this argument and, further, **GRANTS** its second motion for summary judgment in this regard. Accordingly, summary judgment in favor of Allstate on Papanek's counterclaims alleging a breach of the covenant of good faith and fair dealing shall issue.

## C. Tortious Interference with Prospective Business Relationships

In the second claim for relief in Defendants' counterclaim, Papanek alleges that "Allstate intentionally interfered with Melissa's prospective sales and business opportunities by purposefully refusing to approve otherwise qualified prospective buyers" of her economic interest in her Allstate book of business. Doc. 34 at PageID 458. Allstate moved for summary judgment on this claim in its first motion for summary judgment, an argument the Court sustained and, accordingly, granted summary judgment in Allstate's favor. *See* doc. 220 at PageID 6784-86.

Now, Papanek not only seeks to reopen her tortious interference counterclaim; she moves for summary judgment on it in her favor (doc. 305 at PageID 8058-61), a request she did not seek in her original motion for summary judgment. *See* doc. 185 (moving for partial summary judgment

on only her breach of contract counterclaims). In now seeking relief not previously sought, Papanek cites no new law (or law not considered by the Court originally) or new evidence. Doc. 305 at PageID 8058-61. Further, the undersigned finds no clear error of law in its original finding and further finds that no manifest injustice will result by not reconsidering its previous finding. Thus, the Court declines Papanek's request to reconsider the conclusion that summary judgment in favor of Allstate is appropriate on her tortious interference counterclaim.

### D. Papanek Breach of Contract for Soliciting Allstate Business

Next, Papanek seeks reconsideration of the Court's conclusion that, as a matter of law, she solicited business when displayed a sign on the door of the Papanek Agency after receiving the 90-day notice of termination from Allstate. Doc. 220 at PageID 6775-76. Allstate, on the other hand, despite not originally moving for summary judgment in its favor on its breach of contract claim in this regard, now seeks summary judgment in its favor on this issue, *i.e.*, that Papanek breached the non-solicitation provision of the EA Agreement by posting the sign.

In issuing that decision, the undersigned noted that, "[u]nfortunately, the parties [did] not attempt to define the term ["solicit"] in their briefing." *Id*. at PageID 6773. Now, however, Papanek cites persuasive authority to support the proposition that merely informing customers of her change in employment status and providing a contact number does not, in and of itself, amount to a solicitation. The undersigned, in the interest of justice, agrees to reconsider this issue and concludes that mere informational contact with former clients, *i.e.*, advising of a change in employment and providing contact information, does not, in and of itself, amount to a solicitation. *See Wells v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 919 F. Supp. 1047, 1053 (E.D. Ky. 1994). Accordingly, the Court **GRANTS** Papanek's motion to reconsider in this regard and finds

that the hanging of the sign at the Papanek Agency is not, in and of itself, a solicitation as a matter of law.  Therefore, Allstate's motion for summary judgment on this particular issue is **DENIED**.

In addition to the foregoing, Allstate now points to new evidence that Mike Papanek, who founded Phoenix with Melissa Papanek, directly solicited Allstate customers, including an individual named Philip Frary.  Doc. 304 at PageID 7985-86.  Frary testified at a deposition on November 13, 2018 that Mike Papanek initiated a phone call with him, during which Mike informed Frary "[t]hat he was no longer with Allstate and he could have [Frary] some money." Doc. 304-3.  Frary further testified that Mike Papanek called him subsequently, quoted him insurance rates and, as a result, Frary terminated his policies with Allstate on March 30, 2015 -- well within Melissa Papanek's non-solicitation period.  *Id.*

Despite the foregoing undisputed testimony, Papanek argues in opposition that a genuine issue of material fact remains as to whether Frary was solicited in breach of the EA Agreement. Doc. 313 at PageID 8683.  It is not clear to the Court what material fact remains in dispute in this regard and Papanek fails to expound upon this conclusory assertion or offer any evidence to contradict Frary's testimony.  *Id.*  Instead, Papanek argues that this single instance of solicitation of an Allstate customer -- out of the thousands of customers she had as an Allstate agent -- is not evidence sufficient to show a material breach of the EA Agreement.  *Id.*  Thus, it appears Papanek concedes that such conduct is a breach of the non-solicitation provisions of the EA Agreement.

Whether such breach was material so as to obviate Allstate's duty to continue making TPP payments to Papanek, however, remains an issue for trial.  As noted by the Court previously, "[a] breach of one of several terms in a contract does not discharge the obligations of the parties to the contract, unless performance of that term is essential to the purpose of the agreement."  *Kersh v. Montgomery Developmental Ctr., Ohio Dep't of Mental Retardation & Developmental*

*Disabilities*, 519 N.E.2d 665, 668 (Ohio Ct. App. 1987). "Stated another way, default by a party who has substantially performed does not relieve the other party from subsequent performance." *O'Brien v. Ohio State Univ.*, No. 06AP–946, 2007 WL 2729077, at *27 (Ohio Ct. App. Sept. 20, 2007). Materiality of a breach is determined by considering:

> the extent to which the injured party will be deprived of the expected benefit, the extent to which the injured party can be adequately compensated for the lost benefit, the extent to which the breaching party will suffer a forfeiture, the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has acted with good faith and dealt fairly with the injured party.

*LaSalle Bank Nat'l Ass'n v. Belle Meadows Suites L.P.*, No. 23766, 2010 WL 3195773, at *7 (Ohio Ct. App. Aug. 13, 2010). Materiality of a breach "is generally a question of fact." *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 731 (S.D. Ohio 2006); *DeBoer Structures (U.S.A.), Inc. v. Shaffer Tent and Awning Co.*, 233 F. Supp. 2d 934, 956 (S.D. Ohio 2002).

Accordingly, it appears that Papanek concedes that a breach occurred as to the solicitation of Frary sufficient for Allstate to recover damages for that breach. However, material issues of fact remain as to whether such breach discharged Allstate's obligation to continue making TPP payments.

### E. Defendant's Motion on Allstate's Remaining Claims

Defendants also now seek summary judgment on Allstate's claims alleging misappropriation of trade secrets, tortious interference, and unfair competition. Doc. 305 at PageID 8068-74. The undersigned previously denied Defendants' first motion for summary judgment on these claims because they did not present "a single citation of authority in support of their request[.]" Doc. 220 at PageID 6780.

As noted previously, based on the circumstances presented here, it is improper to reconsider the foregoing argument at this stage. Discovery was reopened, and an opportunity for

further summary judgment proceedings resulted, because of Defendants' failure to timely produce documents in discovery. Doc. 281. Reconsidering the Court's previous ruling would, essentially, reward Defendants for their discovery failures and, therefore, it would not be just to now consider an argument that was not previously preserved for the Court's review. Thus, Defendants' motion for summary judgment is **DENIED** in this regard.

### III.

The Court next addresses the parties' cross-motions for sanctions. Allstate, in its motion for sanctions, argues that Papanek and Phoenix (and their attorneys) violated their discovery obligations when they produced numerous documents after the initial discovery deadline and just weeks before the case was set for trial. Doc. 224. In response, Defendants argue that sanctions are not warranted as a result of the late disclosure of documents because their actions were not willful and because the late disclosure was harmless. Doc. 249 at PageID 7295.

Defendants also respond to Allstate's motion by arguing that sanctions are warranted against Allstate because it failed to preserve the cell phone used by Ted Stefanov during his employment with Allstate -- a phone that was erased upon Stefanov's retirement during the pendency of this case. *Id*. at PageID 7302-05. In this regard, Defendants argue that "Papanek is entitled to an adverse inference that Allstate failed to preserve the requested information from Ted Stefanov's phone because it was unfavorable to Allstate." *Id*. Defendants contend that information on Stefanov's phone bears relevance to "Papanek's termination and the approval or disapproval of potential buyers for her book of business." *Id*. at PageID 7304.

### A. Defendants' Motion for Sanctions Against Allstate.

The Court will first address Defendants' motion for sanctions. "As a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information, including

ESI, when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (citations omitted). Federal Rule 37(e) governs situations where "electronically stored information ["ESI"] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).

Where prejudice has resulted as a result of such failure, a court "may order measures no greater than necessary to cure the prejudice[.]" Fed. R. Civ. P. 37(e)(1). Alternatively, if the offending party "acted with the intent to deprive another party of the information's use in the litigation," the Court can: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2). A showing that ESI was not preserved and lost as a result of negligence, or even gross negligence, is insufficient for relief under Rule 37(e)(2). *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016).

Here, the undersigned finds the adverse inference requested by Defendants, and any other potential sanction, unwarranted for a number of reasons. First, because Allstate possessed the contractual right to terminate Papanek's EA Agreement without cause, and because, as noted above, Allstate had the contractual right to approve or disapprove potential purchasers, Allstate's motivations for these actions are of minimal relevance to the claims and defenses to be tried. (Also, Allstate's motivation for terminating the EA Agreement, even if relevant to the claims and defenses at trial, does not appear to be disputed.) In other words, even assuming Stefanov's phone contained discoverable information, the loss of such information has not prejudiced Defendants. Accordingly, relief under Rule 37(e) is not appropriate.

Further, there is no evidence before the Court at this time suggesting that Stefanov's phone was erased with any intent to deprive Defendants of use of the information contained on the phone. In fact, no evidence before the Court at this time suggests that the information requested by Defendants existed on Stefanov's phone. According to Allstate's attorneys, shortly after it received Defendants' document requests, and well before Stefanov retired, Stefanov reviewed the contents of his phone and found no responsive information. Doc. 249-4 at PageID 7317. All other Allstate employees from whom Defendants sought similar information also reviewed their devices and found no responsive information -- which, notably, would have included any text messages received from or sent to Stefanov. *See id*. at PageID 7316-20. Counsel independently reviewed the devices used by Tom Schmitt and Cathy Fouty and confirmed that no responsive information existed on them, thus satisfying counsels' obligations under Rule 26(g). *Id.*

Finally, assuming responsive ESI was erased from Stefanov's phone, Defendants have failed to show that those text messages could not have been "restored or replaced through additional discovery[,]" *see* Fed. R. Civ. P. 37(e), such as through issuance of a subpoena to Stefanov's cell phone service providers.[4] Accordingly, based on all of the foregoing, Defendants' cross-motion for sanctions (doc. 249) is **DENIED**.

### B.    Allstate's Motion for Sanctions Against Defendants

There can be no reasonable dispute that "[p]arties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant documents." *Bratka v. Anheuser-Busch Co.*, 164 F.R.D. 448, 463 (S.D. Ohio 1995). Attorneys for the parties, in certifying that each discovery response is, *inter alia*, "complete

---

[4] Text messages to or from Stefanov, if they existed, also would have been otherwise discovered from devices of other Allstate employees. As already mentioned, no such messages were found on the devices from which Defendants otherwise sought discovery, *i.e.*, the devices of, *inter alia*, Tom Schmitt, Cathy Fouty or Jamie Newton. *See* doc. 249-2.

and correct," must engage in a reasonable inquiry as to the correctness and completeness of each response. *See* Fed. R. Civ. P. 26(g)(1). Further, "trial counsel must exercise some degree of oversight to ensure that their [client] [is] acting competently, diligently and ethically in order to fulfill their responsibility to the Court." *Bratka*, 164 F.R.D. at 461. The undersigned would further conclude that the duties regarding oversight by trial counsel extends to their subordinates, such as associates, paralegals, and the like. *Cf. id.*

"[T]he underlying principles governing discovery [have] not change[d] just because ESI is involved." *Brown v. Tellermate Holdings Ltd.*, No. 2:11-CV-1122, 2014 WL 2987051, at *2 (S.D. Ohio July 1, 2014), *adopted as modified*, No. 2:11-CV-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015). Thus, where, as here, ESI is involved, "[c]ounsel still have a duty (perhaps even a heightened duty) to cooperate in the discovery process; to be transparent about what information exists, how it is maintained, and whether and how it can be retrieved; and, above all, to exercise sufficient diligence (even when venturing into unfamiliar territory like ESI) to ensure that all representations made to opposing parties and to the Court are truthful and are based upon a reasonable investigation of the facts." *Id.*

Federal Rule 37(d) permits discovery sanctions against a party for providing incomplete discovery responses, including responses to Rule 34 document requests. *See* Fed. R. Civ. P. 37(d); *Jackson by Jackson v. Nissan Motor Corp. in USA*, No. 88-6132, 1989 WL 128639, at *3-5 (6th Cir. Oct. 30, 1989). "[E]ven a negligent failure should come within Rule 37(d)." Fed. R. Civ. P. 37, Advisory Committee Notes to 1970 Amendment. In fact, courts have permitted sanctions under Rule 37(d) where the discovery failure at issue resulted from mere negligence. *Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030, 1032 (5th Cir. 1990); *Lew v. Kona Hosp.*, 754 F.2d 1420, 1427 (9th Cir. 1985); *E.E.O.C. v. Sears, Roebuck & Co.*, 114 F.R.D. 615, 627 (N.D. Ill. 1987);

*Jindan Wu v. Seoul Garden, Inc.*, No. 116CV03613ARRST, 2018 WL 507315, at \*12 (E.D.N.Y. Jan. 22, 2018).

The sanctions permitted under Rule 37(d) for providing an incomplete document production include those listed under Fed. R. Civ. P. 37(b)(2)(A)(i) through (iv) -- *inter alia*, designating certain "facts be taken as established for purposes of the action," "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[,]" and "staying proceedings until the order is obeyed[.]" Fed. R. Civ. P. 37(b)(2)(A). The Court here, without objection, reopened discovery with regard to Defendants' late document disclosure. *See supra*. Accordingly, the undersigned finds no further sanction under Rule 37(b)(2)(A) necessary or appropriate, even assuming, *arguendo*, that sanctions were otherwise appropriate. Given that full discovery on the late document disclosure has occurred, and given the preference that matters be decided on the merits, no undue prejudice will result from a full presentation of facts and from the jury weighing those facts without facts being deemed established or adverse inferences being drawn.

However, Rule 37(d)(3) requires that a Court "must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the [discovery] failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(d)(3). The undersigned declines at this time to determine the issue of whether Defendants' discovery failure justifies the imposition of sanctions and, if so, whether such failure was substantially justified or whether an award of reasonable expenses associated with some or all of the discovery during the reopened discovery period would be unjust. Instead, the Court **DEFERS** a ruling on this issue until after trial.

**IV.**

For the foregoing reasons, the Court **ORDERS** as follows: (1) Plaintiff's motion to reconsider summary judgment (doc. 303) is **GRANTED IN PART AND DENIED IN PART**; (2) Defendants' motion to reconsider summary judgment (doc. 305) is **GRANTED IN PART AND DENIED IN PART**; (3) a ruling on Plaintiff's motion for sanctions (doc. 224) is **DEFERRED** until after trial; and (4) Defendants' motion for sanctions (doc. 249) is **DENIED**.

**IT IS SO ORDERED.**

Date:   December 9, 2019                           s/ Michael J. Newman
                                                   Michael J. Newman
                                                   United States Magistrate Judge